IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JACOB BARRETT, | CV. 06-876-JE |
| Plaintiff, | FINDINGS AND RECOMMENDATION |
| v. | |
| BRIAN BELLEQUE, A. BALES, RANDY GEER, JANE DOE (Mailroom Censor), and M. DODSON, | |
| Defendants. | |

JELDERKS, Magistrate Judge.

Pro se plaintiff, Jacob Barrett, an inmate at the Two Rivers Correctional Institution ("TRCI")[1], brings this action against defendants Brian Belleque, A. Bales, Randy Geer, Jane Doe (Mailroom Censor), and M. Dodson. All defendants are employees of the Oregon Department of Corrections ("ODOC"). Plaintiff alleges that defendants violated his right to free speech and right to freely

---

[1] Plaintiff was recently transferred to TRCI. Prior to his transfer, he was housed in the Intensive Management Unit ("IMU") at the Oregon State Penitentiary ("OSP").

1 - ORDER

exercise his religion under the First Amendment and his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a)(1)-(2), by denying him a piece of mail which defendants contend contained numbers and symbols associated with white supremacist beliefs. In addition, plaintiff alleges that defendants violated his Fourteenth Amendment right to due process by failing to conduct a timely mail review in accordance with applicable Oregon Administrative Rules.

The court issued a Summary Judgment Advice Notice (#19) on December 12, 2006 advising plaintiff of the federal summary judgment standards. Currently before the court are the parties' cross-motions for summary judgment and plaintiff's motion for a preliminary injunction. For the reasons which follow, defendants' Motion for Summary Judgment (#27) should be granted, and plaintiff's Motions for Summary Judgment (#18) and for a Preliminary Injunction (#8) should be denied.

## BACKGROUND

On February 2, 2006, plaintiff received a mail violation notice denying him a piece of mail sent from Fidelitas Publishing. Defendants' Motion for Summary Judgment (#27), Exhibit 103 - Affidavit of Brian Belleque, p. 3. According to defendants, the piece of mail at issue contained numbers and symbols associated with white supremacist beliefs, including the "fourteen words," the number "88" and a depiction of an Othala rune. Defendants'

Memorandum in Support (#28), p. 3. On February 2, 2006 and March 24, 2006, plaintiff requested a review of the mail violation notice. Defendants' Motion for Summary Judgment (#27), Exhibit 103 - Affidavit of Brian Belleque, p. 3. During that time, the OSP investigator responsible for conducting mail reviews became seriously ill and the mail review process was delayed. Id.

On May 5, 2006, defendant A. Bales, the Grievance Coordinator, conducted an in-person mail review with plaintiff, during which plaintiff was permitted to review the material from Fidelitas and explain his position. Id. According to defendants, Bales then referred the materials to Correctional Officer John Birch for further review. Id. Birch and Lieutenant Dennis Long concurred with the decision to withhold the subject piece of mail. Long noted that the mail contained the "fourteen words," the number 88, and the Othala Rune, which are symbols that he asserts are associated with Security Threat Groups ("STGs"). Id. at 4. Finally, Brian Belleque, Superintendent at OSP, issued a final review notice, dated October 5, 2006, recommending that the decision to withhold the subject piece of mail be upheld.

In the present action, plaintiff alleges that defendants violated his right to free speech and right to freely exercise his religion under the First Amendment and his rights under RLUIPA by denying him a piece of mail he asserts is critical to the practice of his chosen faith. In addition, plaintiff alleges that

3 - ORDER

defendants violated his Fourteenth Amendment right to due process by failing to review mail in a timely manner. Plaintiff seeks declaratory, injunctive and monetary relief.

## STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of informing the court of the basis of its motion, and "identifying those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)(internal citation omitted).

"If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.'" Intel Corp. v. Hartford Acc. & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991)(quoting Richards v. Neilsen Freight Lines, 810 F2d 898, 902 (9th Cir. 1987)). Plaintiff "must do more than simply show that there is a metaphysical doubt as to the material facts." Matsushita Elec. Industrial co. v. Zenith Radio, 475 U.S. 574, 586 (1986). Rather, he must come forward with sufficient evidence demonstrating to the court that there are genuine issues of material fact to be decided at trial. Fed. R. Civ. P. 56(e).

4 - ORDER

Plaintiff may not simply rely upon the pleadings to designate specific facts establishing a genuine issue for trial. Celotex Corp., 477 U.S. at 324. The existence of a genuine issue of material fact may be demonstrated through use of affidavits, depositions, answers to interrogatories, and admissions. Id; see also Fed. R. Civ. P. 56(c). If "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita, 475 U.S. at 587 (internal citation omitted).

## DISCUSSION

### I. RLUIPA Claim

RLUIPA prohibits the imposition of substantial burdens on a confined person's religious exercise unless the government establishes that the burden furthers a "compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). This "compelling government interest" and "least restrictive means" test effectively replaced the "legitimate penological interest" test set forth in Turner v. Safley, 482 U.S. 78, 89-91 (1987), which courts had previously applied to "free exercise" claims. Warsoldier v. Woodford, 418 F.3d 989, 994 (9th Cir. 2005)(citing 42 U.S.C. § 2000cc-1(a)). Under its own terms, RLUIPA must be "construed broadly in favor of protecting an inmate's right to exercise his religious beliefs." Id. at 995 (citing 42 U.S.C. § 2000cc-3(g)).

5 - ORDER

An inmate challenging an allegedly unlawful restriction of his religious practice bears the burden of making a prima facie showing that RLUIPA has been violated and that his religious exercise has been substantially burdened. <u>Id</u>. at 994 (<u>citing</u> 42 U.S.C. § 2000cc-2(b)). If the inmate establishes this prima facie case, the government bears the burden of proving that the substantial burden on the inmate's religious practice both furthers a compelling governmental interest and is the least restrictive means of doing so. <u>Id</u>. at 995 (<u>citing</u> 42 U.S.C. §§ 2000cc-1(a), 2000cc-2(b)).

In order to constitute the requisite "substantial burden" on religious exercise, a challenged restriction "must impose a significantly great restriction or onus upon such exercise." <u>Id</u>. at 995. An inmate's religious exercise is substantially burdened "'where the state . . . denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his belief.'" <u>Id</u>. (<u>quoting</u> <u>Thomas v. Review Bd. of the Ind. Employment Div.</u>, 450 U.S. 707, 717-18 (1981)). Even indirect compulsion can substantially burden religious exercise. <u>Id</u>.

Plaintiff contends that by denying him the subject piece of mail, defendants prevented him from obtaining information needed to practice his religion. Complaint (#2), p. 6. Plaintiff asserts that the "Fourteen words": "[w]e must secure the existence of our people and a future for White children," are an integral part of

6 - ORDER

his religious faith of Wotanism (also known as Asatru or Odinism), because emphasis on race and ancestry is essential to the practice of these religions. Id.; Plaintiff's Response to Defendants' Motion for Summary Judgment (#37), Affidavit of Jacob Barrett, p. 2.

Notwithstanding these assertions, a fair examination of the record before the court supports only the conclusion that defendants did not substantially burden plaintiff's right to freely exercise his religion by withholding the single piece of mail at issue here. According to Thomas O'Connor, the Administrator of Religious Services for Oregon Department of Corrections ("ODOC"), the "14 Words" are not part of a religious belief system, and instead represent the number of words contained in the expression that has become the rallying slogan of the White supremacist movement. Defendants' Motion for Summary Judgment (#27), Exhibit 101 - Affidavit of Thomas O'Connor, pp. 2, 4. In addition, O'Connor states that he has sought to identify and make available to inmates, including plaintiff, those items his research has shown are essential to the practice of the Asatru faith. O'Connor contends that he encouraged plaintiff to provide him with authority supporting requests for additional materials or items he deems necessary. Id. at 5-6. Plaintiff provides the court with no copies of requests made to O'Connor for materials containing the aforementioned numbers or symbols or for a subscription to "Fidelitas." According to O'Connor,

7 - ORDER

> ODOC Religious Services has been diligent in working with [plaintiff] and has ensured that his religious needs have been and continue to be met. We have provided him with access to an Asatru volunteer and we have made necessary religious items available to him through the canteen. [Plaintiff] is also free to practice and express his religious beliefs in the privacy of his . . . cell or bunk area, and to gather with up to four other men in the informal settings to discuss and talk about his religious beliefs. . . . No "substantial burden" or even "burden" has been placed on [plaintiff] by denying him access to materials advocating the "14 words. . . ."

Id. at 6-7.

Furthermore, even assuming the "Fourteen Words" are religious in nature and essential to the practice of his faith, plaintiff cannot meet his burden of demonstrating that defendants substantially burdened his religious exercise by withholding the subject piece of mail containing the numbers "14" and "88" and a depiction of the Othala Rune: As plaintiff himself sets forth in some detail and as an examination of plaintiff's *in camera* exhibits confirms, he already has numerous items containing these symbols in his possession. Affidavit of Jacob Barrett (#39), p. 8; Plaintiff's Motion for *In Camera* Inspection (#36).[2]

Given the evidence of defendants' substantial effort to accommodate plaintiff's faith and his admission that he already possesses a significant number of items containing the symbols he

---

[2] Moreover, plaintiff's argument that defendants' prior allowance of materials containing the same symbols they find objectionable here necessarily entitles him to relief is unpersuasive. Whether defendants have acted with perfect consistency in screening inmate mail, and whether they could have constitutionally withheld other materials in plaintiff's possession, are not issues before the court.

8 - ORDER

deems necessary to the practice of his faith, plaintiff cannot demonstrate that defendants' actions in denying him the subject piece of mail imposed a "significantly great restriction or onus" upon the exercise of his religion so as to constitute a "substantial burden." Accordingly, defendants are entitled to summary judgment on plaintiff's first claim.

**II.   First Amendment Claims**

    **A.   First Amendment Right to Freely Exercise One's Religion**

The First Amendment provides, in relevant part, that the government shall not prohibit the free exercise of religion. U.S. Const. amend. I. Nevertheless, free exercise rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." O'Lone v. Shabazz, 482 U.S. 482 U.S. 342, 348 (1987). To prevail on a free exercise claim, an inmate must show that a defendant substantially burdened the practice of his religion by preventing him from engaging in conduct mandated by his faith without justification reasonably related to legitimate penological interests. Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1997).

As discussed above, plaintiff cannot establish that defendants' decision to withhold the piece of mail in question substantially burdened his right to exercise his religion. Accordingly, plaintiff cannot prevail on this free exercise claim.
///
9 - ORDER

**B.    First Amendment Right to Receive Mail**

Prisoners have "a First Amendment right to send and receive mail." Witherow v. Paff, 52 F.3d 264, 265 (9th Cir. 1995). Prison regulations and practices relating to the regulation of incoming mail are analyzed under the Turner reasonableness standard noted above. Turner v. Safley, 482 U.S. 78, 89-91 (1987); Thornburgh v. Abbott, 490 U.S. 401, 413-14 (1989). Under that standard, a prison action is valid if it is reasonably related to legitimate penological interests. Turner, 482 U.S. at 89. In determining the reasonableness of a restraint on an inmate's right to receive mail, courts must consider the following factors: (1) whether there is a valid, rational connection between the action and the stated legitimate government interest; (2) whether there are alternative means of exercising the right; (3) whether accommodation of the right will have an adverse impact on guards, other inmates and prison resources generally; and (4) the absence of ready alternatives. Id. at 89-90.

**1.    Rational Connection to Prison's Legitimate Interests**

Here, the prison withheld the subject piece of mail on the grounds that it contained STG-related material that posed a threat to the security or safety of the institution. Prison security is a legitmate interest, and materials that pose a threat to security in the prison can be excluded on the basis of content. Stefanow v. McFadden, 103 F.3d 1466, 1472 (9th Cir. 1996)(citing McCabe v.

10 - ORDER

Arave, 827 F.2d 634, 638 (9th Cir. 1987)). However, as plaintiff notes, material may not be confiscated simply because it advocates "racial purity." McCabe, 827 F.2d at 638.

Thus, the court must determine whether the subject piece of mail poses a threat of violence within the prison, either because it advocates violence, or because it is "so racially inflammatory as to be reasonably likely to cause violence at the prison." Id. In making that determination, I note that judgments regarding prison security "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." Pell v. Procunier, 417 U.S. 817, 827 (1974).

Dennis Long, OSP Security Threat Group Manager, has submitted an affidavit stating that ODOC attempts to manage groups of inmates who align themselves with one another, including groups based on race. Defendants' Motion for Summary Judgment (#27), Exhibit 102 - Affidavit of Dennis Long, pp. 1-2. According to Long, ODOC wants to limit the activities of inmate groups who pose a threat of harm to inmates and staff. Id. at 2. ODOC's definition of a STG includes the group having a common sign or symbol by which they are identified. Long states that ODOC staff carefully reviews any publication suspected of containing STG symbols. He adds that STG groups often use signs and symbols to communicate their beliefs and

11 - ORDER

that STG affiliates use codes and other furtive means to conceal their illegal actions.  Long further states that:

> Inmates may react spontaneously to inflammatory words or images, and it is very predictable that allowing the inflammatory symbols of the White Supremacist movement, such as 14/88, into ODOC facilities will cause harm.
>
> * * *
>
> White supremacist symbols and literature represent a threat to security because they serve as a rallying point for those inmates who adhere to the tenets of the White supremacist ideal.
>
> * * *
>
> Any symbol that represents a Security Threat Group has the potential to be inflammatory when viewed by inmates who belong to rival groups or groups with opposing views. Inmates who are incarcerated for "their cause" are often seen as martyrs and looked up to for advice and leadership. Possessing White supremacist materials such as the "14 Words" is a way to be identified as such.  In these cases, ODOC staff would review the item in context and make a determination either to confiscate the property or to authorize its possession.
>
> * * *
>
> [Plaintiff] has a history of violence and an extensive list of documented enemies within the prison system.
>
> * * *
>
> Over the past dozen years or so, [plaintiff] has continued to actively engage in neo-Nazi, White supremacist ways of thinking while in prison.  He is identified as Aryan Soldier, which is documented as a White Supremacist STG.[3]

---

[3] The court notes that plaintiff denies that he is known to be a neo-nazi White supremacist and that he contends that he is a <u>former</u> member of the Aryan Soldiers.  Plaintiff's Response to Defendants' Concise Statement of Material Fact (#38), p. 2; Affidavit of Jacob Barrett (#39), p. 9.  Nevertheless, plaintiff does not deny that he was once affiliated with this group that

12 - ORDER

> \* \* \*
>
> The "14 words" describes a phrase frequently used by neo-Nazis and White supremacists. Often used as a greeting, the "14 words" affirms one's affiliation with White supremacy. Sometimes the slogan is stylized as '14W', and sometimes it is combined with '88', as in '14/88', '1488', or '8814'. The '88' stands for the eighth letter of the alphabet twice, or 'HH', the initials of Heil Hitler. '88' can also stand for the book, '88 Precepts', authored by David Lane [the now-imprisoned leader of The Order]. The Othala rune is a hate symbol used by White supremacists sometimes in conjunction with '14/88' but often as a stand-alone symbol of hate.
>
> \* \* \*
>
> ODOC continues to monitor STGs as they revise their symbols, names, and purposes. We continue to review STG designations and to modify our practices to meet the needs of the Department. The overall goal remains: to provide a safe and secure facility for all those incarcerated as well as those who work inside ODOC institutions.

Id. at 3-5.

Critically, as discussed above, defendants have presented evidence that the threat of violence posed by the "14 words," stems not from their literal meaning, which as plaintiff argues may be viewed as merely advocating racial purity, but from their symbolic power to inflame tensions amongst rival groups within the prison. I find no evidence in the record to suggest that the prison officials' security concerns are unreasonable or exaggerated. Under the circumstances, the connection between the withholding of the subject piece of mail and the prison's asserted security

---

advocates violence and terrorist activity or that he has engaged in hostile and violent behavior toward prison staff. Affidavit of Jacob Barrett (#39), pp. 10-11.

13 - ORDER

concerns is not "so remote as to render the [action] arbitrary or irrational." Stefanow, 103 F.3d at 1474 (quoting Turner, 482 U.S. at 89-90)). Therefore, the first Turner factor weighs in favor of the defendants.

### 2. Alternative Means of Exercising the Right

As noted above, the record establishes that the prison has afforded plaintiff a "good measure of religious freedom." Stefanow, 103 F.3d at 1474. Moreover, although there is no alternative means for plaintiff to read and possess the particular piece of mail at issue here, he has other items containing the symbols on the mailing which he deems necessary to the practice of his faith. Accordingly, the second Turner factor also favors the defendants.

### 3. Effect on Guards, Prisoners, and Prison Resources

As discussed above, defendants have submitted unrebutted evidence that prison officials reasonably concluded that enabling inmates to receive racially inflammatory mail would endanger other inmates and prison staff. These "collateral dangers" support defendants' decision to withhold the piece of mail in question. Id.

### 4. Ready Alternatives

Defendants contend that they only restrict content that is STG-related or deemed to incite violence and insist that there are no readily available alternatives to this practice, other than to allow material into the institution that threatens the security of

14 - ORDER

staff and inmates. Memorandum in Support of Defendants' Motion for Summary Judgment (#28), p. 8. Plaintiff has not presented an alternative accommodation that does not compromise the prison's valid penological interests, and such an alternative is difficult to envision. See Id. at 1475.

Accordingly, the record before the court supports only the conclusion that defendants' action in withholding the subject mailing was sufficiently linked to the legitimate government interest of security.

### III. Due Process Claim

Plaintiff contends that defendants violated his due process rights by failing to conduct a mail review within the 45 day period set forth in OAR 291-131-0050(B)(e). However, violations of state law or state administrative rules do not, without more, provide a basis for a section 1983 claim. See Broam v. Bogan, 320 F.3d 1023, 1028 (9th Cir. 2003)(to allege a section 1983 claim, plaintiff must show he or she was deprived of a right secured by the Constitution and laws of the United States; section 1983 is a "method of vindicating federal rights"); Ybarra v. Bastian, 647 F.2d 891, 892 (9th Cir. 1981)(only federal rights, privileges, or immunities are protected by section 1983; "[v]iolations of state law alone are insufficient.").

Due process rights are not created by state procedural rules. Olim v. Wakinekona, 461 U.S. 238, 250 (1983). Therefore, a state's violation of its own state procedural rules does not violate a

15 - ORDER

federal constitutional guarantee unless the state also failed to comply with the procedural requirements arising under the federal Constitution. <u>Winburn v. Bologna</u>, 979 F.Supp. 531, 535 (W.D. Mich. 1997). Constitutional due process requires that an inmate whose mail is rejected receive notice as to the rejection of the material addressed to him, and that complaints about the rejection be referred to a prison official other than the person who originally disapproved the correspondence. See <u>Procunier v. Martinez</u>, 416 U.S. 396, 417-19 (1974) overruled on other grounds; <u>Thornburgh</u>, 490 U.S. at 413-14.

Plaintiff contends that defendants violated OAR 291-131-0050(B)(e) regarding the timeliness of mail reviews. The undisputed evidence, however, shows that plaintiff received notice as to the rejection of the subject piece of mail, and received administrative review of that rejection from a prison official who was not the person who initially rejected the mailing. Concise Statement of Facts in Support of Defendants' Motion for Summary Judgment (#29), pp. 1-2; Plaintiff's Response to Defendants' Concise Statement of Material Fact (#38), pp. 1-2. Plaintiff concedes that he received a first level review, but insists that a second level review was never held and that defendants "generated a final review final finding of facts," after he filed this civil rights case. Affidavit of Jacob Barrett (#39), pp. 14-17. Defendants contend that Correctional Officer Birch and Long reviewed the materials that were the subject of the mail violation

16 - ORDER

and concurred with the findings of the first review. Defendants' Motion for Summary Judgment (#27), Exhibit 103 - Affidavit of Brian Belleque, p. 4, Att. 2, p. 4. Thereafter, Belleque issued a "Final Review for Mail Violation Notice" dated October 5, 2006, wherein he recommended that the mail violation be upheld. Regardless of whether defendants complied with Oregon Administrative Rule relating to a formal second review or timeliness of mail reviews, plaintiff cannot show that any failure on defendants' parts to comply with the Oregon Administrative Rules resulted in a violation of his federal due process rights because the evidence supports only the conclusion that plaintiff received notice of the mail violation and an administrative hearing.

Because defendants are entitled to summary judgment for the reasons set out above, I need not and do not address their alternative arguments. Because plaintiff cannot prevail on the merits of this action, he is not entitled to preliminary injunctive relief.[4]

///

///

///

---

[4] A preliminary injunction is appropriate if the plaintiff demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable injury; or (2) the existence of serious questions going to the merits and the balance of hardship tips sharply in the plaintiff's favor. Sony Computer Entertainment Am., Inc. v. Bleem, LLC, 214 F.3d 1022, 1025 (9th Cir. 2000); Prudential Real Estate Affiliates v. PPR Realty, Inc., 204 F.3d 867, 874 (9th Cir. 2000).

17 - ORDER

**RECOMMENDATION**

Defendants' Motion for Summary Judgment (#27) should be GRANTED, and plaintiff's Motions for Summary Judgment (#18) and for a Preliminary Injunction (#8) should be DENIED.

**SCHEDULING ORDER**

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have ten (10) days from the date of service of a copy of this recommendation within which to file specific written objections. Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issue, and will constitute a waiver of a party's right to appellate review of the findings of fact in order of judgment entered pursuant to the Magistrate Judge's recommendation.

DATED this  6th  day of July, 2007.

                                      /s/ John Jelderks
                                      John Jelderks
                                      United States Magistrate Judge